IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 22-00166-02-CR-W-DGK |
| v. | ) | |
| | ) | |
| CORY T. BROWN, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION TO
DENY DEFENDANT'S MOTION TO SUPPRESS**

Before the Court is Defendant Brown's Motion to Suppress.  (Doc. 76)  Defendant Brown moves the Court to suppress all evidence recovered from the October 14, 2021, search of 1206 Quail Creek Drive, Independence, Missouri, and of his person.  For the following reasons, it is recommended that Defendant's motion be denied.

## I.  INTRODUCTION

An Indictment was returned on July 12, 2022, charging Defendant Brown with one count of Felon in Possession of a Firearm, in violation of 18 U.S.C. §§ 922(g)(1) & 924(a)(2).  (Doc. 1)  On December 1, 2022, Defendant filed the instant motion to suppress.  (Doc. 76)  On January 3, 2023, the Government filed its suggestions in opposition (Doc. 84), and Defendant Brown replied on January 12, 2023.  (Doc. 87)  An evidentiary hearing was held on February 24, 2023,[1] with all parties and counsel appearing in person.  The Government appeared by Assistant United States Attorney Ashleigh Ragner.  Defendant Brown was present and represented by Michael Belancio.

The Government called Special Agent Timothy Flohrschutz and Special Agent Douglas McKelway of the Federal Bureau of Investigation as witnesses.  The following exhibits were

---

[1] The delay in holding this hearing was due, in part, to issues regarding Defendant Brown's representation.

1

admitted into evidence without objection:

> Government's Exhibit 1:    Google Map of 1206 Quail Creek Drive
> Government's Exhibit 8:    Photo – Front Door of 1206 Quail Creek Drive  (FBI_00082)
> Government's Exhibit 9:    Photo – Back Door of 1206 Quail Creek Drive (FBI_00102)

The below exhibits were admitted into evidence over Defendant Brown's objection, and the Court

took judicial notice of the same:

> Government's Exhibit 2:    Pen Register/Trap and Trace Order – 21-PR-00098-LMC
>                            (WARR_00148-00160)
> Government's Exhibit 3:    Search Warrant for Prospective Location Data – 21-SW-
>                            00453-LMC (WARR_00236-00259)
> Government's Exhibit 4:    Search Warrant for Cell Site Simulator – 21-SW-00454-
>                            LMC (WARR_00260-00280)
> Government's Exhibit 5:    Search Warrant for 1206 Quail Creek Drive – 21-SW-
>                            00452-LMC (WARR_800214-00235)

As a preliminary matter, the Government requested the Court to rule on the issue of

standing before proceeding with the remainder of the hearing.  (Tr. 12)  Due to the current timeline

and impending trial, the Court took all evidence over the Government's objection.  (Tr. 13)  This

matter was then taken under advisement.[2]

## II.    <u>FINDINGS OF FACT</u>

Based on the evidence presented at the suppression hearing, the Court submits the following

proposed findings of fact:

1.    Special Agent Douglas McKelway has been employed by the Federal Bureau of

Investigation for approximately seven years.  (Tr. at 16)  Special Agent McKelway served in the

United States Navy for seven-and-one-half years before joining the FBI.  (Tr. at 16)  At the FBI,

he has worked primarily as an investigator in the Violent Crimes and Gangs Unit, and, as of about

six years ago, concurrently as a SWAT team member, and a medic on the SWAT team.  (Tr. at

---

[2] The Court notes its Report and Recommendation is issued four business days after the evidentiary hearing due to tight timelines.

16–17)

2.      As a part of his job, Special Agent McKelway investigated the group self-identified as "246" in tandem with the Kansas City Police Department and Internal Revenue Services. (Tr. 17) During this investigation Special Agent McKelway became familiar with Defendant Cory Brown. (Tr. 17) Special Agent McKelway testified that Defendant Brown associated with violent individuals, had a history of law enforcement evasion, and had been suspected in multiple homicides. (Tr. 17, 33, 63) Special Agent McKelway had never personally questioned Defendant Brown about a homicide, nor was he aware of Defendant Brown ever being charged with, or convicted of, a homicide. (Tr. 46–47, 62)

3.      On October 1, 2019, a Grand Jury indited several members of 246 including Defendant Brown. (Tr. 17) A warrant was issued for Defendant Brown's arrest on that date. (Tr. 17) At some point in time, the FBI had wanted posters out for Defendant Brown's arrest. (Tr. 63–64) Defendant Brown was not apprehended until October 14, 2021. (Tr. 17)

4.      On October 14, 2021, the Dallas, Texas FBI office received a tip from a walk-in individual regarding a possible location of Defendant Brown and Deontaye Whitley. (Tr. 18, 39) At approximately 12:00 p.m., Special Agent Tim Neylen, while the tipster was present, contacted Special Agent McKelway. (Tr. 41–42) Special Agent McKelway received the following information:

      a.  Defendant Cory Brown and Deontaye Whitley were en route to Kansas City, Missouri to retaliate for the shooting of Delmeko Brown, a relative of Defendant Brown, earlier that week; (Tr. 18)

      b.  Defendant Brown and Mr. Whitley were in a silver Mercedes with a Texas license plate 30597B1; (Tr. 18, 19)

3

c. The Mercedes was parked in the area of an apartment complex somewhere around the block of 1900 Quail Creek Drive, Independence, Missouri; (Tr. 18, 19) and

d. Mr. Whitley was using phone number 816-724-3699. (Tr. 19–20)

5. At that time, Special Agent McKelway did not speak with the tipster, did not know if Special Agent Neylen had received information from this source before, did not know the tipster's criminal history, and was not provided the identity of the tipster. (Tr. 40, 41, 42, 46) This tipster initially declined financial compensation, then accepted it over one year later. (Tr. 49)

6. Shortly after Special Agent McKelway received that information, he testified that he contacted supervisors and leaders of different teams and partnering agencies and arranged for assets to verify the location of the Mercedes. (Tr. 21) Special Agent McKelway recognized Delmeko Brown's name as an associate of Defendant Brown. (Tr. 20) He assumed they were cousins based on the same last name. (Tr. 20) That same day, October 14, 2021, he was able to verify that on October 13, 2021, Delmeko Brown had been shot and injured. (Tr. 20, 75)

7. The FBI SWAT team was deployed at 12:50 p.m. on the same day the tip was received. (Tr. 22) Law enforcement first located the Mercedes in the apartment complex at 1:10 p.m. (Tr. 22, 49); specifically, the car was parked near 1206 Quail Creek Drive. (Tr. 22) The Mercedes was located based on the tipster's information that the Mercedes would be in that area. (Tr. 22–23) At that point in time, law enforcement had not conducted any work regarding the phone number provided for Mr. Whitley. (Tr. 23, 31) SWAT members were staged within a two-to-three-minute drive, and inconspicuous surveillance investigators were placed in and around the apartment complex. (Tr. 23–24)

8. At approximately 1:40 p.m., three unidentified individuals left in the Mercedes. (Tr. 24) The driver wore a red balaclava. The face covering was not a covid or medical mask.

4

(Tr. 76)  It was akin to a ski mask or a mask undercover law enforcement wear when deployed to make arrests.  (Tr. 24, 76–77)

9.      Investigators could not identify the occupants of the Mercedes and therefore refrained from stopping the Mercedes out of an abundance of caution.  (Tr. 25)  Special Agent McKelway testified that Defendant Brown is known to have a history of fleeing law enforcement in vehicles.  (Tr. 21, 25)  Even if law enforcement would have been able to identify Defendant Brown in the Mercedes, without an imminent danger of violence, intercepting the car at that time would create a risk of harm to the suspects, officers, and the general public.  (Tr. 25–26)

10.      Law enforcement followed the Mercedes back to the apartment complex, where the Mercedes re-parked at approximately 2:00 p.m.  (Tr. 26, 30)  The  three individuals walked back into the complex.  (Doc. 84, at p. 3)  One of the passengers was seen carrying a bag that appeared to have a long rigid object, consistent with a firearm, inside.  (Tr. 62, Doc. 84, at p. 3)

11.      Special Agent McKelway was initially parked on the outer perimeter and facilitated communication.  (Tr. 26)  Once the Mercedes returned, Special Agent McKelway repositioned to a nearby parking area in closer proximity to the apartment building to continue surveillance.  (Tr. 26–27)

12.      Sometime in the four o'clock hour, it was determined that law enforcement would seek location data from Mr. Whitley's phone.  (Tr. 31–32)  Special Agent McKelway testified that acquiring cellular location data became increasingly important because investigators had not yet been able to locate Defendant Brown and Mr. Whitley.  (Tr. 32)  He worried that a vehicle swap may have occurred such that Defendant Brown and Mr. Whitley were no longer with the Mercedes.  (Tr. 32)

13.      Special Agent Flohrschutz was contacted to facilitate an emergency acquisition of

5

Cell Site Location Information ("CSLI") from 816-724-3699. Special Agent Flohrschutz received verbal notification at approximately 4:40 p.m. that the Department of Justice had approved the emergency acquisition, and he received written verification of the same at 5:06 p.m. (Tr. 85–86)

14.     Timothy Flohrschutz has been a special agent with the FBI since 2015. (Tr. 80) Before that, Special Agent Flohrschutz served in the United States Navy as an intelligence specialist and, from October 2006 to February 2015, he served with the Bellevue, Nebraska Police Department. (Tr. 81) Special Agent Flohrschutz has had multiple FBI assignments, including to the Kansas City Division of the Violent Crimes Squad, and again as its coordinator with the Fugitive Task Force, briefly to the International Terrorism Squad, and currently to FBI headquarters in the Cellular Analysis Survey Team. (Tr. 81) In June of 2022, Special Agent Flohrschutz was declared one of the sixteen National Assets in the Cellular Analysis Survey Team. (Tr. 82) His skills are utilized for both national and international surveillance, and his expertise is often sought for emergency situations. (Tr. 82)

15.     In these types of situations, as a part of his job, Special Agent Flohrschutz makes an independent exigency determination. (Tr. 84) Special Agent Flohrschutz testified to his knowledge of the tip, which was largely consistent with the same details provided through Special Agent McKelway's testimony, and he determined an emergency existed based on the tipster's information. (Tr. 83–84)

16.     At 4:53 p.m., Special Agent Flohrschutz contacted AT&T with an emergency request for historical CSLI, precision location (pings), an emergency pen register, and subscriber information for 816-724-3699.[3] (Tr. 84, 98) As an expert in this area, Special Agent Flohrschutz explained the differences between pings, cell cite simulator, and an emergency pen register with

---

[3] The Court will collectively refer to this information as "phone data" unless specified otherwise.

trap and trace:

    a. <u>Precision location (also known as a ping)</u>: This is a network estimation of where the device is located.  (Tr. 94)  The information typically is provided in the form of a latitude and longitude with a degree of uncertainty.  (Tr. 94)  The degree of uncertainty is the radial distance used to create a circle of proximity around the geo coordinates.  (Tr. 94, 96)  The phone is likely somewhere within that proximity.  (Tr. 94)  Pings will often move slightly even if the device might have remained stationary.  (Tr. 96)  Any significant movement, such as leaving the apartment complex and moving to another part of town, would be noticeable and direct the investigation elsewhere.  (Tr. 97)

    b. <u>Pen Register Trap and Trace</u>: Pursuant to 18 U.S.C. § 3125, the Department of Justice may authorize the use of an emergency pen register.  (Tr. 85)  Deputy Assistant Attorney General approval is required to commence the operation of an emergency pen register.  (Tr. 84)

    c. <u>Subscriber information and cell site simulator</u>: Subscriber information is requested to obtain the International Mobile Subscriber Identifier ("IMSI").  (Tr. 89–90)  The IMSI is the identification number tied to the SIM card placed in a mobile device. (Tr. 90)  If the SIM card is switched into a new device,  the IMSI transfers with the SIM card to the new device.  (Tr. 93)  Once retrieved, the IMSI is placed into the cell site simulator.  (Tr. 90)  The cell site simulator then connects with the mobile device and provides a direction based upon where the signal is coming from and the signal's strength.  (Tr. 90)  Using the main simulator alone would make identifying a single unit in a multi-story dwelling nearly impossible.  (Tr. 90)  To narrow the scope, a hand-held

7

simulator device is deployed to re-measure the signal's strength based on different locational factors, such as the strength of the signal on floor one versus two versus three. (Tr. 90) A cell-site simulator operates similarly to a pen register. (Tr. 85) Although, not required by statute, Department of Justice policy requires it be treated as a pen register. (Tr. 85)

17. The first ping was received at 5:02 p.m. and roughly every fifteen minutes thereafter. (Tr. 86, 95) The pings created a circle of proximity that covered the apartment complex and a couple thousand meters, or approximately a mile, into the surrounding area. (Tr. 95–96)

18. At 5:59 p.m., investigators ran the license plate of another departing vehicle. (Tr. 53) Special Agent McKelway testified that he believed the license plate search or another database search corresponded to Myron McMillian and the address of 1206 Quail Creek Drive. (Tr. 53, 54) The address on Mr. McMillian's driver's license also associated him with 1206 Quail Creek Drive. (Tr. 54) At this time, Special Agent McKelway was not familiar with Myron McMillian but was familiar with a Michael McMillian through his investigations of Defendant Brown. (Tr. 52) Additionally, at some point, law enforcement received a list of tenants from the management office. (Tr. 52) The list was reviewed for known associates of Defendant Brown. (Tr. 52)

19. At 6:52 p.m., a black Escalade arrived at the Quail Creek apartment complex near 1206 Quail Creek Drive. (Tr. 34, 63) Two unidentified individuals arrived at the same time. (Tr. 34, 63)

20. At 7:21 p.m., Special Agent Flohrschutz received the subscriber information and historical CSLI on 816-724-3699. (Tr. 87) Although requested, the emergency pen register trap and trace with cell-site location data was not received prior to terminating surveillance. (Tr. 87–88) The mobile device associated with 816-724-3699 was subscribed to by Deontaye Whitley out

8

of Irving, Texas. (Tr. 88) The historical CSLI was consistent with that number leaving Texas at approximately 6:45 p.m. on October 13, 2021, and arriving in the Kansas City area at approximately 2:30 a.m. on October 14, 2021. (Tr. 88) The phone had remained around Quail Creek Drive for most of October 14, 2021. (Tr. 88) At some point in time after receiving the subscriber information, law enforcement identified 816-724-3699 using a cell site simulator as being located at 1206 Quail Creek Drive. (Tr. 33–34, 90–91)

21.     At 7:38 p.m., the Escalade that had arrived at 6:52 p.m. left the apartment complex without law enforcement identifying who was inside. (Tr. 34–35, 63) Law enforcement followed the Escalade and attempted a traffic stop. (Tr. 35) The Escalade did not stop, and a high-speed chase ensued. (Tr. 34, 35, 63)

22.     Special Agent McKelway testified that at that point in time the decision was made to move in and surround the apartment. (Tr. 35–36) From his training and experience, Special Agent McKelway knew that individuals leaving a residence often call the remaining occupants about the presence of law enforcement. (Tr. 36) 1206 Quail Creek Drive has brick enclosures around either side of its front door which block its visibility. (Gov't Ex. 8, Tr. 28–29) The back door is a sliding glass door. (Gov't Ex. 9, Tr. 29) There is a brick enclosure around the patio and a half-walled brick enclosure across from the back door that obscures the view into the apartment. (Gov't Ex. 9, Tr. 29)

23.     After law enforcement had begun to approach, but before announcing their presence, someone started to walk out the front door, slammed the door, and then four individuals ran from the back. (Tr. 36, 71) Law enforcement, therefore, never announced their presence. (Tr. 71)

24.     At 7:43 p.m., the four individuals were arrested and identified as Deron Chrisman,

Myron McMillian, Deontaye Whitley, and not until after the red balaclava was removed, Defendant Brown. (Tr. 30, 36, 75) Law enforcement identified Myron McMillian, Deontaye Whitley, and Defendant Brown as the three individuals seen in the Mercedes. (Tr. 24, 30) The driver of the fleeing Escalade was identified as Wade Cozart. (Tr. 34, 35, 63) The individual who arrived at the same time as Wade Cozart was identified as Deron Chrisman. (Tr. 34)

25. Defendant Brown was arrested approximately where the individual taking the photograph marked as Government's Exhibit #9 stood. (Tr. 77)

26. Mr. Whitley's phone was found on his person during his arrest. (Tr. 36) During his post-arrest interview, Mr. Whitley told law enforcement his phone number was 816-724-3699, the same number as provided by the source. (Tr. 20, 37)

27. A search warrant for 1206 Quail Creek Drive was then sought and signed on October 14, 2021, at 11:18 p.m. (Gov't Ex. 5, Tr. 55) The search warrant application took several hours to prepare. (Tr. 55) Obtaining a search warrant is typically a collaborative process between the agent and assigned Assistant United States Attorney before it is finalized, approved, and then submitted to the Magistrate Judge. (Tr. 78–79) Pursuant to the search warrant, and with a follow-up warrant to review the phones, law enforcement discerned that three recovered cell phones belonged to Defendant Brown, none of which were assigned the phone number 816-724-3699. (Tr. 37)

28. On October 15, 2021, warrants for historical CSLI and post-use authorization for an emergency pen register and cell site simulator for phone number 816-724-3699 were sought and approved. (Gov't Ex. 2–4, Tr. 58) On the pen register application prepared and signed by the Assistant United States Attorney, the subject of the investigation is listed as Defendant Brown. (Gov't Ex. 2, Tr. 61) While not the affiant, Special Agent McKelway believes it was written with

Defendant Brown's name because there was an open federal investigation on Defendant Brown at that point, and Mr. Whitley was not the subject of the overarching investigation. (Tr. 61) Attachment A to the pen register listed the subscriber as "unknown." (Gov't Ex. 2, Tr. 58) Special Agent McKelway testified this designation does not mean that law enforcement did not care whose phone it was. (Tr. 59)

## III.   <u>PARTIES' ARGUMENTS</u>

Defendant Brown seeks to suppress all evidence obtained during the searches of 1206 Quail Creek Drive, Independence, Missouri, and of his person on October 14, 2021. (Tr. 4) Specifically, Defendant Brown asserts the warrantless obtainment of phone data from Deontaye Whitley's cell phone was unlawful and in violation of Defendant Brown's Fourth Amendment rights. (Doc. 76, at p. 4) Without such phone data, Defendant Brown contends the law enforcement would not have located 1206 Quail Creek Drive, and the two subsequent searches would not have occurred. (Doc. 76, at p. 4) Defendant Brown requests the derivative evidence from the use of phone data be suppressed as fruit of the poisonous tree. (Tr. 4) The evidence appears to consist of, *inter alia*, the Glock with which he is charged, additional firearms, ammunition, cash, false identification documents, drugs, and drug paraphernalia. (Doc. 76, at pp. 1–2)

The Government responds with three arguments. First, the Government states Defendant Brown lacks standing to challenge the phone data search. (Doc. 84, at pp. 6–9) Second, the phone data was lawfully obtained due to exigent circumstances. (Doc. 84, at pp. 10–14) Third, even if the phone data was unlawfully obtained, the evidence from the two searches should not be suppressed due to the attenuation doctrine. (Doc. 84, at pp. 14–16)

## IV. DISCUSSION

Standing must be determined before the Court proceeds to the merits of Defendant Brown's constitutional challenge. *United States v. Sierra-Serrano*, 11 F.4th 931, 934 (8th Cir. 2021). Due to the proximity of the suppression hearing to the pretrial conference and trial setting, and for the sake of judicial economy, the Court also evaluates the merits of Defendant Brown's motion.

### A. Standing

The Government challenges Defendant Brown's standing to suppress evidence as derived from use of information from a third-party phone. (Tr. 8–9; Doc. 84, at pp. 6–9) Defendant Brown asserts that he has standing because the information sought was used to locate him, and thus, he is a victim of a warrantless search under the Fourth Amendment.[4] (Tr. 9; Doc. 87, at pp. 4–5) The burden is on Defendant Brown to affirmatively establish standing by a preponderance of the evidence. *United States v. Bettis*, 946 F.3d 1024, 1027 (8th Cir. 2020); *United States v. Maxwell*, 778 F.3d 719, 732 (8th Cir. 2015) (requiring an affirmative showing). The imperative question is "whether the person claiming a constitutional violation 'has had his own Fourth Amendment rights infringed by the search and seizure which he seeks to challenge.'" *Byrd v. United States,* 138 S.Ct. 1518, 1526 (2018) (quoting *Rakas v. Illinois*, 439 U.S. 28 (1978)). Fourth Amendment rights attach when an individual "*personally* has an expectation of privacy in the place searched, and . . . his expectation is reasonable." *Sierra-Serrano*, 11 F.4th at 933 (emphasis added).

Cellular location tracking data is treated like content stored within a phone: the expectation of privacy must be in the phone at issue. *United States v. Turner*, 781 F.3d 374, 381 n.8 (8th Cir. 2015) (determining privacy interests exist in the phone regardless of whether the acquisition is the

---

[4] Defendant Brown relies on the automatic standing doctrine established by *Jones v. United States*, 362 U.S. 257 (1960), a case which has been overruled by *United States v. Salvucci*, 448 U.S. 89, 95 (1980) ("We are convinced that the automatic standing rule of *Jones* has outlived its usefulness in this Court's Fourth Amendment jurisprudence.").

location or stored content).  There must be a "sufficiently close connection" between the challenger and the object searched to establish an expectation of privacy.  *United States v. Gomez*, 16 F.3d 254, 256 (8th Cir. 1994).  The following considerations — known as the *Pierson* factors — are relevant, but not exhaustive, to analyze the connection:

> ownership[;] possession and/or control[;] . . . historical use[;] . . . ability to regulate access; the totality of the circumstances surrounding the search; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of the expectation of privacy given the specific facts of the matter.

*United States v. Pierson*, 219 F.3d 803, 806 (8th Cir. 2000).  With respect to the *Pierson* factors, ownership, possession, and historical use are particularly relevant in the context of determining an expectation of privacy in a third-party phone.  *See Turner*, 781 F.3d at 382.

Defendant Brown argues that he had a reasonable expectation of privacy in his own movements, and therefore, had a reasonable expectation of privacy in Mr. Whitley's phone data as he contends it was used to track Defendant Brown's location when they were together.  (Tr. 103–105)  Rather than substantively addressing the *Pierson* factors, Defendant Brown cited *Carpenter v. United States* and *United States v. Jones* as more recent and relevant case law.[5]  (Tr. 104)  *Carpenter* establishes that a reasonable expectation of privacy exists in one's chronicled physical movements as it relates to historical records of CSLI of one's own phone.  138 S.Ct. 2206, 2219–2220 (2018).  Notably, the *Carpenter* holding is "narrow."  *Id.* at 2220 ("We do not express a view on matters not before us: real-time CSLI or 'tower dumps'.").  The Court in *United States v. Jones* found the physical intrusion of placing a GPS device on a car constitutes a search.  565 U.S. 400, 404 (2012).  It is not disputed, for the purposes of this analysis,[6] that the phone data obtainment

---

[5] When asked for the basis of his assertion, Counsel referred to the Supreme Court jurisprudence cited in Defendant Brown's briefings.  (Tr. 104)  Other than the decision in *Jones v. United States*, *Carpenter v. United States* and *United States v. Jones* are the only cases cited that match Counsel's description.

[6] "The Government also assumes, only for purposes of analysis in this case, the use of the cell-site simulator was a

was a search, nor it is disputed that <u>Mr. Whitley</u> has a privacy interest in the historical CSLI log that tracked his prior movement. *Carpenter* and *Jones* do not assist Defendant Brown in establishing a reasonable expectation of privacy in Mr. Whitley's phone or the phone data therefrom.[7] *See* Opinion and Order, *United States v. Paciorek*, 2021 WL 3616731, at *2 (D. Minn. Aug. 18, 2021), 21-cr-38 (ECT/LIB) (rejecting standing claim based on *Carpenter* as the defendant lacked legitimate expectation of privacy to challenge third party's cell records).

The Eighth Circuit, pre-*Carpenter*, addressed a standing challenge in *United States v. Turner*, 781 F.3d 374 (8th Cir. 2015). Turner moved to suppress evidence from warrants issued to obtain co-defendants' prospective phone location information. *Id.* at 382. The Eighth Circuit held that Turner did not have standing to challenge the evidence seized from these warrants as he had no reasonable expectation of privacy either in the co-conspirators' phones or the location data therefrom. *Id.*

The parties have not cited, nor has this Court identified, an Eighth Circuit standing decision post-*Carpenter* as to third-party phone data. Nevertheless, arguments like that raised by Defendant Brown here, post-*Carpenter*, have met the same fate in other courts. *See, e.g., Paciorek*, 2021 WL 3616731, at *2 (finding defendant did not have standing to challenge third-party phone information for lack of reasonable expectation of privacy); *United States v. Beverly,* 943 F.3d 225, 238 (5th Cir. 2019) (holding defendant lacked standing to challenge use of third-party data because defendant did not have an expectation of privacy in the third-party phone); *United States v. Oakes*, 320 F.Supp.3d 956 (M.D. Tenn. 2018) (determining that *Carpenter* does not extend to third-party

---

search under the Fourth Amendment." (Doc. 84, at p. 6)
[7] Moreover, as addressed in the merits discussion, phone data was not requested, let alone obtained until well after law enforcement officers located the tipster-identified silver Mercedes in the Kansas City Metro area of Quail Creek Drive, Independence, Missouri, and phone data was not used to track or locate Defendant Brown's physical movements.

14

phone data and does not disturb traditional Fourth Amendment standing principles.)

Here, the tipster told the FBI that 816-724-3699 was being used by Mr. Whitley. (Fact 4) The phone associated with that number was found on Mr. Whitley's person. (Fact 26) Mr. Whitley stated 816-724-3699 was his phone number during his post-arrest interview. (Fact 26) AT&T verified Mr. Whitley was the subscriber of that phone number. (Fact 20) No information has been provided to the contrary,[8] nor does Defendant Brown offer evidence of any of the *Pierson* factors to demonstrate his connection to, or an expectation of privacy in, Mr. Whitley's phone or movements. In sum, Defendant Brown has failed to meet his burden to establish standing. Accordingly, the Court recommends a finding that Defendant Brown's suppression motion be denied on this ground.

## B. Merits of the Motion

Even if Defendant Brown were found to have standing, the Court recommends denial of his suppression motion on the merits. The essence of Defendant Brown's claim is that his Fourth Amendment rights were violated by the warrantless acquisition of phone data from Mr. Whitley's phone, and but for that violation, law enforcement would not have arrived at 1206 Quail Creek Drive. As a result, he requests suppression of the evidence obtained therefrom pursuant to the exclusionary rule.

### 1. Identification 1206 Quail Creek Drive

At the outset, the timeline demonstrates that 1206 Quail Creek Drive would have been discovered by law enforcement notwithstanding the phone data acquisition. At approximately 12:00 p.m., the tip was received. (Fact 4) At 12:50 p.m., the SWAT team and other tactical teams

---

[8] Defendant Brown's argument that the subscriber listed as "unknown" in attachment A of the pen register application is unavailing. The attachment and application were prepared and signed by the Assistant United States Attorney and reflected information known at the time. Special Agent McKelway testified that did not reflect law enforcement's lack of care regarding whose phone it was. (Fact 28)

were deployed for surveillance at the Quail Creek Complex. (Fact 7) At 1:10 p.m., the Mercedes was located using the tip alone. (Fact 7) At 1:40 p.m., three individuals left in the Mercedes and then returned at approximately 2:00 p.m. (Facts 8, 10) One individual's face was completely covered by a balaclava. (Fact 8) Another individual had a large bag containing a long, rigid item, consistent with a firearm. (Fact 10)

At approximately 4:00 p.m., law enforcement diverged into two clear courses of investigation: on-site surveillance and securing phone information. (Fact 12) Law enforcement continued on-site surveillance, while Special Agent Flohrschutz pursued information from Mr. Whitley's phone once he received notice at 4:40 p.m. of the Deputy Attorney General's approval. (Facts 11, 13)

Special Agent McKelway remained with surveillance. At 5:59 p.m., through surveillance, investigators identified the name of Myron McMillian after running the license plate of a departing car. (Fact 18) The information returned on the license plate or other database and a driver's license linked Myron McMillian to 1206 Quail Creek Drive. (Fact 18) Mr. McMillian shares the last name of a known associate of Defendant Brown. (Fact 18) At 6:52 p.m., an Escalade arrived. (Fact 19) At 7:38 p.m., the Escalade left, and officers attempted a stop. (Fact 21) The Escalade refused to stop, and a high-speed chase ensued. (Fact 21) Law enforcement therefore moved in, and four individuals ran out the back of 1206 Quail Creek Drive. (Facts 22, 23) They were arrested at 7:43 p.m. — approximately five minutes after law enforcement attempted to stop the Escalade. (Facts 21, 24)

Contemporaneously, at approximately 4:53 p.m. — almost four hours after the Mercedes was spotted — Special Agent Flohrschutz instituted an emergency request to AT&T to receive location information from the tipster-provided phone number. (Fact 16) At 5:02 p.m., Special

Agent Flohrschutz received the first ping, followed by pings approximately every fifteen minutes. (Fact 17)  The phone was likely somewhere in the circle of proximity that included the apartment complex and extended a couple thousand meters, or approximately a mile, beyond the complex. (Fact 17)  At 7:21 p.m., Special Agent Flohrschutz received the subscriber information and the IMSI necessary to use the cell site simulator, as well as the historic CSLI, which further corroborated the tip.  (Facts 4, 20)  At some point in time, but no earlier than 7:21 p.m., the hand-held cell site simulator identified 816-724-3699 in the residence of 1206 Quail Creek Drive.  (Fact 20)

The on-site surveillance corroborated the silver Mercedes information and led officers to discover Mr. McMillian, which in turn also led to 1206 Quail Creek Drive.  Additionally, the on-site surveillance spurred investigators to attempt a traffic stop on the Escalade, and, less than five minutes later, four individuals darted out the back of 1206 Quail Creek Drive.  Although the phone itself was linked to 1206 Quail Creek Drive through use of a simulator in conjunction with Mr. Whitley's phone data, the tip — coupled with the corroboration and extensive onsite surveillance — led officers to 1206 Quail Creek Drive, and ultimately, resulted in Defendant Brown's arrest. Put differently, setting aside the phone data at issue, law enforcement still would have discovered 1206 Quail Creek Drive.  The Government asserts, and the Court agrees, the phone data is not what led officers to 1206 Quail Creek Drive.  Nevertheless, the Court continues with the analysis of  Defendant Brown's suppression arguments.

### 2.   *Exclusionary Rule*

The exclusionary doctrine is the primary judicial remedy to dissuade Forth Amendment violations.  *Utah v. Strieff*,  579 U.S. 232, 237 (2016).  The Court may exclude both evidence obtained as a direct result of an illegal search or seizure and the derivative evidence as fruit of the

poisonous tree. *Id.* There are well-established exceptions to the exclusionary rule, such as the attenuation doctrine and the inevitable discovery doctrine. Exclusion of evidence does not serve the intended purpose of the exclusionary rule when one or more of those exceptions apply. Even if phone data did lead law enforcement to 1206 Quail Creek Drive, the Government contends, and the Court again agrees, that exigent circumstances justified the warrantless obtainment of phone data. The Court will first address the Fourth Amendment challenge as to exigency and probable cause, then turn to exceptions to the exclusionary rule.

a.    Fourth Amendment Analysis

"A warrantless search is reasonable when justified by both probable cause and exigent circumstances." *United States v. Parris*, 17 F.3d 227, 229 (8th Cir. 1994). Probable cause supports a search "where the known facts and circumstances are sufficient to warrant a [person] of reasonable prudence in the belief that contraband or evidence of a crime will be found." *Ornelas v. United States*, 517 U.S. 690, 696 (1996). Independently corroborated information provided by a confidential source may establish probable cause. *United States v. Vinson*, 414 F.3d 924, 930 (8th Cir. 2005) (citing *United States v. Gabrio*, 295 F.3d 880, 883 (8th Cir. 2002)). Imminent circumstances include, *inter alia*, circumstances where lives are threatened or a suspect's escape is probable. *Parris*, 17 F.3d at 229. Specific to the context of phone data acquisition, an emergency situation occurs when there is an "immediate danger of death or serious bodily injury to any person." 18 U.S.C. § 3125(a)(l) (establishing situations in which executive agents may request an emergency pen register and trap and trace device installation); *Carpenter v. United States,* 138 S.Ct. 2206, 2223 (2018) (recognizing the need to "protect individuals who are threatened with imminent harm" as an exigency); *see also United States v. Munoz,* 894 F.2d 292, 296 (8th Cir. 1990) (discussing traditional exigency circumstances). The totality of the

circumstances, "when viewed from the standpoint of an objectively reasonable police officer," must support that an exigent circumstance was present. *United States v. Ball,* 90 F.3d 260, 262 (8th Cir. 1996). "The government has the burden of showing that exigent circumstances existed." *Parris*, 17 F.3d at 229.

Here, both requirements are satisfied thereby making the warrantless acquisition of Mr. Whitley's cell phone data reasonable. Regarding probable cause, the Court finds the testimony as to both Special Agent McKelway and Special Agent Flohrschutz credible. Special Agent McKelway testified that he received a tip that Defendant Brown and Mr. Whitley were traveling to the Kansas City metro for a retaliatory act of violence for the shooting of Defendant Brown's relative. (Fact 4) Law enforcement verified most all components of the tip, including the color, license plate, and make of the car, and found the silver Mercedes parked in the general area described by the tipster. (Facts 4, 7) Additionally, law enforcement verified that the shooting of Defendant Brown's cousin had occurred the day before. (Fact 6) They also observed an individual in the silver Mercedes wearing a complete face covering. (Fact 8) Then they observed a passenger of the same Mercedes exiting with a bag containing a long rigid object, consistent with the shape of a firearm. (Fact 10)

Because a majority of the tip had been corroborated, the presumable inference was that the tipster was reliable, and therefore, the other information that had not yet been corroborated at that point was also reliable, including Defendant Brown and Mr. Whitley's intent to engage in retaliatory violence. Based on the credibility of the tip and the additional observations made during surveillance (namely, the observation of a concealed object resembling the shape of a firearm), a reasonable prudent person would believe that utilizing the phone data would likely lead to evidence of a crime. Such conclusion is further substantiated by the emergency pen register

trap and trace and search warrants issued by the Honorable Lajuana M. Counts the very next day. (Fact 28)

Likewise, the Government met its burden for showing exigency. Despite locating and surveilling the Mercedes, law enforcement had not yet located and identified Defendant Brown and Mr. Whitley. (Fact 12) After almost several hours of surveillance without any use of Mr. Whitley's phone data, Special Agent McKelway worried they might no longer be with the Mercedes. (Fact 12) At that point, law enforcement believed it necessary to add investigation tactics connected to Mr. Whitley's phone to mitigate the threat of imminent violence. (Facts 12, 15) The totality of the circumstances — including Defendant Brown's history, his association with violent individuals, his propensity to flee from law enforcement in a vehicle, the corroboration of his cousin being critically shot the day before and the tipster's information as to the vehicle and its location, the tipster's information about their travel for retaliatory purposes, the observations of what appeared to be a concealed firearm and the individual completely masked, yet no identification of Mr. Whitley or Defendant Brown to that point — would leave an objectively reasonable officer to believe there was a credible threat of imminent and serious bodily injury, and thus, the existence of an exigent circumstance. (Facts 2, 4, 6, 7, 8, 9, 10, 12) As a result, the Court recommends a finding that the warrantless acquisition of Mr. Whitley's phone data did not violate Defendant Brown's Fourth Amendment rights.

b. Exceptions to the Exclusionary Rule

In the alternative, if the warrantless acquisition of phone data were found to be unconstitutional, the Court recommends a finding that the attenuation doctrine prevents the exclusion of evidence.

The attenuation doctrine permits evidence obtained from unconstitutional law enforcement conduct to be admitted when the relationship between the unconstitutional act and the evidence is removed or interrupted by intervening circumstances. *Utah v. Streiff*, 579 U.S. 232, 240–41 (2016). The Court considers the following three factors to determine applicability of this doctrine: 1) the temporal proximity between the unconstitutional conduct and the discovery of evidence; 2) the presence of intervening circumstances; and 3) the "purpose and flagrancy of the official misconduct." *Id*. at 239–241.

Here, the first factor weighs in favor of Defendant Brown. Although, it is unclear precisely when the hand-held cell simulator was able to pinpoint the phone at 1206 Quail Creek Drive, it was no earlier than 7:21 p.m. (Fact 20) Only approximately twenty-two minutes elapsed between the earliest possible receipt of the IMSI for Mr. Whitey's phone and arrests of Defendant Brown, Mr. Whitley, Mr. Chrisman, and Mr. McMillian, followed shortly thereafter with search incident to arrest, protective sweep, etc. (Facts 16, 20, 24) Such a short interval between the allegedly unconstitutional act and discovery of the evidence "counsels in favor of suppression." *Streiff*, 579 U.S. at 239–40 (citing *Brown v. Illinois*, 422 U.S. 590 (1975)).

Contrastingly, the second factor weighs strongly in favor of applying the attenuation exception. A valid, predated warrant is sufficient to sever the casual chain between unconstitutional conduct and discovery of evidence. *Id.* at 241. The tipster provided information that Defendant Brown was traveling to the Kansas City metro, and law enforcement verified that the vehicle in which Defendant Brown was suspected to have travelled was parked near 1206 Quail Creek Drive. (Fact 4) Law enforcement did not know that Defendant Brown was at 1206 Quail Creek Drive until the balaclava was removed after he fled from the apartment. (Fact 24) Once the balaclava was removed, officers executed the two-year old warrant for his arrest. (Facts 24,

25)  The existence of the arrest warrant and wanted posters for Defendant were known to law enforcement.  (Fact 3)

Finally, the third factor also weighs in favor of applying the attenuation doctrine.  Here, law enforcement credibly believed exigent circumstances existed and followed 18 U.S.C. § 3125 and Department of Justice policy when requesting Mr. Whitley's phone data on an exigent basis.  (Facts 4, 7, 13, 15, 28)  The Government properly sought Deputy Attorney General approval and timely followed up with the appropriate pen register and warrant requests the very next day as mandated by statute in exigent circumstances where non-judicial approval is utilized.  (Fact 13, 15, 28)  Even if deemed mistaken, law enforcement conduct here was not flagrant misconduct. *Streiff*, 579 U.S. 232 at 241 (finding lawful conduct after a mistaken decision does not support exclusion).

 On balance, the factors weigh against suppression and in favor of applying the attenuation exception to the exclusionary rule.  Accordingly, the Court recommends a finding that Defendant Brown's motion be denied on this ground, as well.

The inevitable discovery doctrine — another exception to the exclusionary rule — allows evidence to be admitted that would have otherwise been discovered without the unconstitutional conduct.  *Nix v. Williams,* 467 U.S. 431, 440–42 (1984).  "[T]he [G]overnment must prove by a preponderance of the evidence: (1) that there was a reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct, and (2) that the government was actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation."  *United States v. Smith*, 21 F.4th 510, 517 (8th Cir. 2021) (quoting *United States v. Conner*, 127 F.3d 663, 667 (8th Cir. 1997)).  The second prong may be satisfied if law enforcement "have in mind 'an alternative plan' that they would have executed if the constitutional

22

violation had not occurred." *United States v. Baez*, 983 F.3d 1029, 1040 (8th Cir. 2020) (quoting *United States v. Hammons*, 152 F.3d 1025, 1030 (8th Cir. 1998)).

As to the second prong, significant here is the actual timeline of surveillance conducted before, during, and aside from the acquisition of phone data. Nevertheless, while the inevitable discovery doctrine may apply, the Court is not able to draw an ultimate determination given the limited scope of the issue and record before it.

### IV. CONCLUSION

For the reasons set forth above, it is

RECOMMENDED that the Court, after making an independent review of the record and the applicable law, enter an order denying Defendant's Motion to Suppress (Doc 76).

Counsel are advised that, pursuant to 28 U.S.C. § 636(b)(1), each has fourteen days from the date of this Report and Recommendation to file and serve specific objections to the same, unless an extension of time for good cause is obtained. Failure to file and serve timely specific objections may result in waiver of the right to appeal factual findings made in the Report and Recommendation which are accepted or adopted by the District Judge except upon the ground of plain error or manifest injustice.

_____ */s/ Jill A. Morris* _____
JILL A. MORRIS
UNITED STATES MAGISTRATE JUDGE

23